## Succession of James McCalop.

Service of citation on defendant's overseer and at his plantation, is sufficient.

It is the settled rule that a creditor may enforce the payment of his claim against a succession, either by direct action, or by way of opposition to the account of the executor.

An under-tutor of minors is not a necessary party, where their natural tutor is a party and has no interest adverse to that of the minors.

APPEAL from the District Court of West Baton Rouge, *Robertson*, *J*. *J. W. & J. E. Elam*, attorneys for testamentary executor and appellants. *G. S. Lacey* and *T. G. & P. H. Morgan*, for *Menard & Vignaud*, appellees.

Voorhies, J.   The appellees, *Menard & Vignaud*, brought an action in the District Court of East Baton Rouge against *John B. Scudder* and the testamentary executor of the late *James McCalop*, to recover the sum of $19,864 03, alleged to be due them by *Scudder*, and for which the testator was liable as surety.   There was a judgment in favor of the plaintiffs for the sum of $15,738 03, and the executor appealed.   On the 2d of July, 1852, a judgment was rendered by the Supreme Court, reducing the plaintiffs claim to the sum of $12,122 74, with interest from judicial demand.   See 7 An. 387.

A writ of fieri facias was issued on this judgment, directed to the Sheriff of the parish of West Baton Rouge, who proceeded to execute it by seizing a number of slaves belonging to the testator's succession.   An injunction was obtained by the executor on the ground, among others, that the plaintiffs could enforce the payment of their judgment against the succession, if at all, only in due course of administration after having called upon the executor to render an account, and not by virtue of a writ of fieri facias.

On the 19th March, 1853, the property seized was released and the writ returned by order of the plaintiffs, in consequence of which the injunction was dissolved at their costs.

On the 21st March, 1853, the appellees obtained an order from the Clerk of the District Court of West Baton Rouge, where the succession was opened, directing the executor to render an account of his administration.   The executor excepted to the appellees' right, as creditors, or otherwise, to make such a call during the pendency of the injunction suit, and, also filed an answer and reconventional demand.   On motion of the appellees' counsel, the exception, answer, and reconventional demand were dismissed by the District Court, on the ground that the executor was bound to render an account; that such pleas could only be urged after an opposition had been made to an account filed.— We do not think the judge *à quo* erred.   The Act of 1837 makes it the duty of all executors to render, at least once every twelve months, an account of their administration, and by the act of 1846, the Clerks of the respective District Courts in the country, are invested with the power to grant orders, directing such executors as may be delinquent to perform the duties thus enjoined upon them.   The course pursued by the executor was therefore manifestly irregular. It is clear that the pleas filed by him could not consistently have preceded the rendition of his account, which was essential to constitute the foundation for the action of the creditors in asserting their claims against the estate.   The rules for the settlement of successions administered by executors, are clearly

and explicitly laid down in our codes. We think if the executor had followed them as his guide in this instance, he would have avoided much unnecessary complication and confusion in the proceedings. C. C. 1663, 1168 et seq. C. P. 987, 988 et seq.

Finally, an account was rendered by the executor on the 15th December, 1853. It was opposed by the appellee, on the ground that they were not classed as creditors for the amounts claimed by them, viz:

1. $12,122 74, with interest from judicial demand and costs, amount of the judgment of the Supreme Court in their favor.

2. $2,500, the joint and several note of *Scudder* and *McCalop*, endorsed by *Scudder*, dated 20th March, 1850, payable twelve months after date, and duly protested for non-payment, with interest and cost of protest.

3. $3,000, the joint and several note of *Scudder* and *McCalop*, endorsed by *Scudder*, and duly protested for non-payment, with interest and cost of protest.

On motion of the appellees' counsel, the heirs of the testator were made parties and ruled to show cause why the provisional tableau filed by *Nolan Stewart*, the executor, should not be homologated and approved. The *Heirs* filed an answer, accepting it as a correct statement of the affairs of the estate, and setting forth also various matters of defence against the appellees' demand. At this stage of the proceedings, *Nolan Stewart*, the executor, and *Catherine Stewart*, wife of *Alfred A. Williams*, and one of the heirs of the testator, died, the latter leaving minor children. *Alfred A. Williams* was then appointed dative testamentary executor of the testator; and was also confirmed as natural tutor to his minor children. Upon the suggestion of the death of these parties, the proceedings were revived against *Williams*, and a judgment by default was taken against him.

The regularity of this judgment, or tacit issue, is contested on the ground of the insufficiency of the service of the citation and petition, which was made during *Williams'* absence on his overseer *at his plantation*. It is objected that it does not appear to have been made at the house of *Williams* in the manner prescribed by Article 189 and 201 of the Code of Practice. According to the interpretation of those Articles in the case of *Maxwell* v. *Collier*, 6 R. 86, we must consider the service as sufficient.

It is also objected that the minor children of the late *Mrs. Williams*, have not been legally brought before the Court, the under-tutor not having been notified of the pendency of the proceedings. On the hypothesis that it is necessary, under the act of 1853 (Session Acts of 1853, p. 293,) to cite the heirs in order to authorize the homologation of a tableau, it may be doubted whether the law-maker intended thereby that an answer should be filed or issue joined by them. The right of the heirs to intervene for the protection of their interest in the proceedings for the homologation of a tableau has never been contested. This enactment may be considered as a means to secure to them the exercise of that right. A different view of the law, it seems to us, might give rise to protracted litigation, resulting necessarily in the majority of cases, to the serious injury of the creditors, whose rights are considered by law to be paramount to those of the heirs, who have only a residuary interest.— However, be this as it may, we think the minors are legally represented by *Williams* as their natural tutor, and that he has no interest in opposition to their interest in this controversy. Hence is is unnecessary to make the under-tutor a party to the proceedings.

29

It is also objected that the appellees were bound, under Article 986 of the Code of Practice, to obtain, by an action in the ordinary manner, a judgment liquidating their claim. It is the settled rule, that a creditor may proceed to enforce the payment of his claim against an estate either by a direct action or by way of opposition to the account of the executor. 10 L. 356, 5 An. 709.

The appellees' claim, founded on the judgment of the Supreme Court, must be viewed as having the authority of the thing adjudged. C. P. 123, 3 An. 86. It follows, therefore, as a necessary consequence, that all the matters urged as grounds of defence in the present controversy, which were litigated and decided in that suit, must be considered as closed. We do not think there is any ground for the proposition, that in consequence of the acts of the appellees, the controversy between the parties has been opened again. It appears that the appellees after having obtained the judgment in question, instituted another suit in the District Court of West Baton Rouge, involving the same cause of action, except the notes claimed in this litigation. In one of the allegations contained in their petition, they advert to the judgment, declaring that should the same be affirmed and paid in whole or in part, the amount so paid would operate as a credit *pro tanto* upon the several items of indebtedness claimed by them. To this action, the defendant pleaded the exception of his *lis pendens*, and also pleaded to the merits. On the 6th of October, 1852, this suit was dismissed on motion of the plaintiff's counsel. We have been unable to perceive anything in the proceedings of that suit calculated to affect the interest of either of the parties.

In relation to the appellees' claim, founded on the two notes in controversy we think it is clearly shown that they were not included in the demand in the suit in which the judgment resulted in their favor. On the trial of that suit in the District Court these notes were offered in evidence in connection with a supplementary petition, but ruled out on the defendants' objection. In sustaining the objection, the Judge said: "considering that said notes could not be received under the pleadings, and that an amended petition could not, at this stage of the cause be admitted, rejected the evidence, reserving, however, to the plaintiffs, the right hereafter to prosecute their claim upon the said notes."

The payment of these notes is contested on the ground of want of consideration. It is urged that *Scudder* and *McCalop* were never credited with the proceeds of, or ever received any valuable consideration for said notes, which must be looked upon only as accommodation paper for the benefit of the appellees. The testimony of *Scudder* himself is chiefly relied upon to sustain this allegation. The Judge *à quo* in his decision says: "It appears from the testimony of *Davis*, Cashier of the Louisiana Bank, that these two notes were not discounted, but placed in that Bank for collection, and protested at maturity, which fact is established by the protests on file. The whole of the transactions between *McCalop, Scudder, Menard* and *Vignaud*, would go to show that they are the *bona fide* holders of these two notes. I pay no attention to the testimony of *John B. Scudder*, who, being liable upon the notes, is not a competent witness." We have carefully considered the testimony of this witness in connection with his correspondence with the appellees and the other circumstances disclosed by the record, and we are not prepared to say that the Judge *à quo* erred in his conclusion. The account given by *Scudder*, in relation to the disposition which was to have been made of the note of $2500, is not satisfactory. If it was given to the appellees, as he says, for the purpose of renewing a note of $3000,

signed by himself, and endorsed by the testator, it is somewhat singular that these notes do not correspond either in form or in amount. If intended as a renewal, why was it not made payable at the Canal Bank? It appears that the note due the Canal Bank was protested on the 23d March, 1850. *Scudder* sent a note for a similar amount for the purpose of renewing it. On the 17th May, 1850, he wrote to the appellees, saying: "I am in hopes that you will sell that note of $3000 and settle that note in the Canal Bank." The appellees, it appears, were unable to effect that arrangement, and obtained from *Scudder* his joint and several note with the testator for $5,500, dated 27th May, 1850, and payable 5th March, 1851, out of the proceeds of which the Canal Bank note was taken up. On the 5th June, 1850, the appellees wrote to *Scudder*, stating that his note of $5500 had been discounted and the proceeds applied as follows: $3,050 33 to Canal Bank; $176 76 to Dr. Beaumont; $192 40 to Citizens' Bank; and $14 to Pino, leaving $1134 76 to his credit. In relation to the note taken up they say: " We return the same herewith enclosed together with your note for $3000, to the order of Mr. *McCalop*, which we could not use, so that you may show them to your endorser cancelled." *Scudder* answered this letter saying: "I received yours of June 5th, and thank you for the arrangement with the Canal Bank." He approved of the disposition of the proceeds of the note, and added that he had drawn on the appellees for $180 37 to pay *Lesage & Chopin*, &c. From this we must infer that the note of $2500, in possession of the appellees since the 10th of March, 1850, was not given for the renewal of the $3000 note due the Canal Bank.

It is therefore ordered and decreed that the judgment of the District Court be affirmed with costs.